James R. CORCORAN et al., Plaintiffs,

v.

**ALLIED SUPERMARKETS, INC., a Corporation, Defendant.**

No. 71 C 35(1).

United States District Court,
E. D. Missouri, E. D.

May 25, 1973.

Carp & Morris, Clayton, Mo., Hyman G. Stein and Chas. A. Seigel, Hullverson, Hullverson & Frank, St. Louis, Mo., for plaintiffs.

Husch, Eppenberger, Donohue, Elson & Cornfeld, St. Louis, Mo., Honigman, Miller, Schwartz & Cohn, Detroit, Mich., for defendant.

MEREDITH, Chief Judge.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

This matter was tried to the Court on the question of liability only. The Court makes the following findings of fact and conclusions of law:

### *Findings of Fact*

1. The plaintiffs are thirty-four individuals, who are citizens of the States of Missouri and Illinois, and were formerly employed in the St. Louis area in the Bettendorf-Rapp Division of defendant Allied Supermarkets, Inc. Defendant is a Delaware corporation, engaged in the retail grocery business in more than twenty-three states which were organized in separate autonomous retail divisions of which the Bettendorf-Rapp operation is typical. This division in 1970 employed over two thousand employees located in thirty-three supermarkets, plus a warehouse and office facility. Defendant's principal place of business is Detroit, Michigan. The amount in controversy exceeds $10,000.00.

2. Plaintiffs seek recovery in two counts. The first count seeks recovery under a contract between defendant and Teamsters Local Union 688, which contract provided for a guaranteed annual wage. The second count charges the defendant with the wrongful and malicious interference with the fiduciary relationship owed by the Union to its members, including plaintiffs. By 1958 defendant had acquired the Bettendorf stores in St. Louis and the Rapp stores in St. Louis, which combined constituted the

Bettendorf-Rapp Division. This Division continued as a separate division until business was discontinued on October 10, 1970. Between 1958 and 1970 the collective bargaining agreement in effect between defendant and Local 688 was signed to designate the company in various manners such as "Bettendorf-Rapp", "Bettendorfs", "Bettendorf-Rapp Supermarkets", "Bettendorf-Rapp Division", and "Allied Supermarkets, Inc." The contract dated June 1, 1970, designated the company as "Bettendorfs" and was to expire on May 31, 1973. This contract continued the provision under Article XXVII, which provided that fifty percent of the regular employees shall be guaranteed employment of at least two thousand straight-time hours during each calendar year which the contract is in effect. The article further provided that, if during the life of the agreement, which ran to May 31, 1973, the stockholders should decide to liquidate the company or to consolidate with some other company, then this guarantee may be cancelled on thirty days written notice to the union.

3. During the fiscal year which ended on June 27, 1970, the Bettendorf-Rapp Division lost over $1,664,000, defendant Allied Supermarkets lost totally $4,850,000, and during the fiscal year 1971 Allied lost $12,090,000. Because of this precarious financial condition, defendant's senior vice president for personnel and industrial relations director, Mr. Charles E. Martin, on July 24, 1970, went to St. Louis, Missouri, where he had an appointment with Harold Gibbons and Richard Cavner, officers of Local 688. Gibbons was out of town, but Martin advised Cavner of the recent liquidation of defendant's west coast division and also advised Cavner of the financial condition of the company. On August 4, 1970, Martin met with Harold Gibbons and advised him that it was necessary to liquidate the Bettendorf-Rapp Division in St. Louis because of the losses. Gibbons raised the question of the applicability of the guaranteed annual wage in the contract. Gibbons contended it did apply. Martin contended it did not apply because the entire division was being liquidated. Martin advised that the company would not pay the guaranteed annual wage. Gibbons inquired as to whether or not the company would be able to meet its payroll and the earned vacation pay obligations of the contract. Martin advised that it would be able to meet the earned vacation pay. No agreement was reached on contract settlement. On September 1, 1970, Martin met with Cavner and advised that Allied was unable to find a purchaser for the entire division and there was a tentative sale for twenty-five stores with Schnucks, but it did not include the warehouse and office. Cavner insisted on the applicability of the guaranteed annual wage. Martin stated that it was not applicable. Cavner countered that if the guaranteed annual wage were not paid, the company must pay six months severance pay, which was rejected by Martin.

4. Between August 4 and October 5, 1970, Martin asked Gibbons and Cavner to keep their discussions confidential for the reason that Martin was dealing with twenty other unions involved with the Bettendorf-Rapp Division and public disclosure would result in loss of customers to the store, financial damage to the stock of the company which was publicly traded, loss of employees and other additional problems. Gibbons and Cavner kept this information confidential and at a meeting of stewards on September 27, 1970, Gibbons advised the stewards that he had received "no written notice and that we should tell them [the employees] not to worry about it." A purchase agreement had been entered into between Schnucks and defendant Allied on September 30, 1970, which provided that the purchase agreement could be terminated if either party released any information to the press without the consent of the other party. On Sunday, October 4, 1970, a meeting was held of all of the Bettendorf-Rapp office and warehouse employees. Levi Sanford, vice president of Local 688, presided

over the meeting. Sanford advised the employees that no official written notice had yet been received from Bettendorf-Rapp. Sanford also told the employees that if a thirty-day notice of liquidation was given by the company in writing, then the guaranteed annual wage would not be applicable. He also advised that in the event of closing, efforts would be made to negotiate for severance pay and any other benefits which could be obtained. A five-member committee of warehouse and office employees was elected to assist in advising the membership and in negotiations. On Monday, October 5, 1970, the employees were notified in writing that Bettendorf-Rapp was liquidating on October 10, 1970. Written notice was given to the union on the same day. There were also newspaper stories concerning the proposed sale to Schnucks. On October 6, 1970, the five-man committee composed of plaintiffs Manson, Voerg, Corcoran, plus Gummels and Weida, met with Sanford. Sanford advised them that the guaranteed annual wage had been discussed with local attorneys for the union and that it probably did not apply. Sanford requested authority for the highest union officials to negotiate the best pay settlement possible with company officials from Detroit. The committee agreed with this request. Sanford advised that he would report to the membership on Thursday, October 8, 1970. The five-member committee reserved the meeting hall for October 8th and advised the membership that there would probably be a severance proposal agreement to be discussed on the October 8th meeting. On October 7th, Martin met in Chicago with Gibbons, Cavner, the international president of Teamster, Frank Fitzsimmons, and international's attorney, David Previant. Previant advised Cavner and Gibbons privately that it was questionable as to whether or not the guaranteed annual wage was applicable and that it would take two years of expensive litigation to determine the applicability of the guaranteed annual wage. Additionally, the financial condition of defendant might make collection of a judgment, even if obtained, precarious. A settlement of differences was reached at this meeting in Chicago, which provided for six weeks severance pay, plus all accrued vacation pay and the employees at the warehouse were to be retained until such time as the warehouse closed down. Schnucks did not take the warehouse. This agreement was written in longhand by Previant, who also included an indemnification clause to the union. Martin returned to St. Louis, Cavner stayed in Chicago and returned the following morning, but called Sanford and explained the settlement to him. The agreement was typed up in St. Louis on the following morning and provided for a complete settlement of all provisions of the agreement between the parties. On October 8, 1970, the union membership meetings were held at each shift and a total of four meetings were held. Sanford presided at the meetings and explained to the membership that the six-weeks severance pay and vacation pay was in lieu of any guaranteed annual wage and all additional benefits under the contract. The proposal was approved by the secret ballot vote of eighty-nine to twenty-two.

5. Checks were issued to all the employees for six weeks severance pay, and the checks were cashed by all of the plaintiffs, with the exception of one. Severance pay amounted to $152,000.00, accrued vacation pay amounted to $30,000.00. None of the plaintiffs have offered to return any of the severance pay received.

6. Teamsters Local Union No. 688 was the duly certified collective bargaining agent for all of Allied's employees at its Bettendorf warehouse, as well as other employees who were parties to a multi-unit collective bargaining agreement with the union.

*Conclusions of Law*

1. This Court has jurisdiction by virtue of diversity of citizenship and the amount in controversy exceeds $10,000.00.

2. Local 688 of the Teamsters Union, as the exclusive bargaining agent

for the plaintiffs, had a right to settle the contract differences between the defendant and the employees who are here the plaintiffs.

 3. The settlement agreement between the union and the defendant entered into on October 8, 1970, was ratified by the union members on that date. The union members, including the plaintiffs, were fully informed that the settlement constituted a complete release of the company.

4. Neither the union nor the company committed any fraudulent acts nor entered into any conspiracy to deprive the plaintiffs of their rights.

5. The company in no way wrongfully interfered with the union to deprive plaintiffs of their rights under the collective bargaining agreement.

6. The release given by the union to the company, and ratified by the employees, and the payment of severance pay and vacation pay to all employees, including the plaintiffs, constitute complete settlement of the contract in question. The plaintiffs are barred from recovering in this cause of action. The action will be dismissed with prejudice.